## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

SNAC LITE, LLC, d/b/a　　　　　}
NATURALLY MORE,　　　　　　　}
　　　　　　　　　　　　　　　　}
　　　**Plaintiff,**　　　　　　　　}
　　　　　　　　　　　　　　　　}
**v.**　　　　　　　　　　　　　　}　　**Case No.:  2:14-cv-01695-RDP**
　　　　　　　　　　　　　　　　}
NUTS 'N MORE, LLC,　　　　　　}
　　　　　　　　　　　　　　　　}
　　　**Defendant.**　　　　　　　}

## MEMORANDUM OPINION

### I.　　Introduction

This case is before the court on Defendant's Motion for Summary Judgment (Doc. # 56), Defendant's Motion to Exclude Testimony of Robert Robicheaux, Ph.D. (Doc. # 57), Defendant's Motion to Exclude Testimony of Steve Lovoy, Jr. (Doc. # 58), Plaintiff's Motion for Summary Judgment (Doc. # 97), Plaintiff's Motion to Strike Helen McDaniel as Expert Witness (Doc. # 49), and Plaintiff's Motion to Exclude Trial Testimony Michael R. Solomon, Ph.D. (Doc. # 61).  The Motions have been fully briefed, and the parties have responded and replied to the Motions. (Docs. # 51, 76, 77, 78, 80, 81, 82, 83, 84).

In this Lanham Act suit, Plaintiff alleges that Defendant misrepresented the protein content of its specialty nut butters, and seeks injunctive relief, an order requiring Defendant to correct any erroneous impression Defendant's alleged false advertisement created, an award of its lost profits, disgorgement of Defendant's profits, and recovery of its attorney fees. (Doc. # 36).  *See* 15 U.S.C. § 1125.  Defendant contends that Plaintiff's claim must be dismissed for two reasons: (1) Plaintiff and Defendant are not direct competitors; and (2) Plaintiff cannot meet its

burden of proving causation and proximate causation. The parties also dispute whether the testimony of the expert witnesses is due to be stricken.

## II. Relevant Undisputed Facts[1]

Both Plaintiff and Defendant are nut butter manufacturers. Plaintiff markets and sells four types of peanut butters and almond butters: Naturally More Peanut Butter, Naturally More Almond Butter, PowerPB, and Peanut Power Butter. (Doc. # 69-5 at 11:1-5, 13:22-17:15, 19:1-12). In contrast to traditional peanut butter spreads, Plaintiff's products are enhanced with added protein, flax seed, and other nutrients. (Doc. # 69-5 at 12:8-12). Based on these enhancements, Plaintiff markets its products as more healthy alternatives to traditional, non-fortified nut butters. (Doc. #69-5 at 54:18-23). Plaintiff's products sell at retail prices higher than many mass market peanut butters. Plaintiff's Naturally More peanut butter sells for $3.29 to $4.99 per jar. (Doc. # 69-5 at 39:11-18). Plaintiff's Naturally More almond butter sells for $8.99 to $12.99 per jar, and Plaintiff's Power Butter and Power PB sell for $9.99 to $12.99 per jar. (Doc. # 69-5 at 39:11-18).

Defendant also markets and sells enhanced high protein peanut and almond butters. (Doc. # 69-1 at 25:3-18). Defendant's products contain a variety of enhancements, including added protein, fiber, organic flax, and natural sweetener. (Doc. # 69-1 at 96:10-15, 126:25-127:2). Defendant also promotes its products as enhanced alternatives to traditional nut butters, and its nut butters sell for $10.99 to $15.99 per jar. (Doc. # 93-8 at ¶5).

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Although Plaintiff and Defendant both produce specialty nut butters, the parties' products have distinct nutritional profiles and marketing strategies. Plaintiff's products are enhanced with pea protein.[2] (Doc. # 69-5, 30:14-31:19). By contrast, Defendant's products are enhanced with whey protein. (Doc. # 69-1, 96:10-15, 126:25-127:2). Further, Plaintiff's nut butter products are sweetened with added sugar, while Defendant's products are sweetened with xylitol (a natural sweetener derived from birch) rather than sugar. (Doc. # 69-5, 11:1-5, 13:22-17:15, 19:1-12; Doc. # 69-1, 96:10-15; 126:25-127:2). Defendant's products come in a number of flavor varieties[3], while Plaintiff's products are only available in "traditional" peanut butter and almond butter flavors. (Doc. # 69-5, 11:1-5, 13:22-17:15, 19:1-12).

Defendant markets its products with a distinctive, fitness-oriented, brand personality. (Doc. # 92-3 p. 8; Doc. # 69-1, 55:18-56:4; 64:1-12). Defendant sells its products at fitness and supplement shows, GNC stores, Whole Foods stores, and through online retailers. (Doc. # 69-3, 8:10-19; Doc. # 92-3 p. 10). In branding its products, Defendant often uses social media websites and touts its products by highlighting its "celebrity" customers. (Doc. # 69-1, 55:18-58:24; Doc. # 93-8 at ¶4). By contrast, Plaintiff does not advertise in fitness magazines, attend trade shows, or have a social media "presence". (Doc. # 69-5, 42:5-43:4). Plaintiff sells its products at grocery stores such as Walmart, Publix, Giant Eagle, Shop Rite, Kroger, and HEB. (Doc. # 69-5, 20:21-22:8). Additionally, Plaintiff sells its products at GNC, Vitamin Shoppe, and other "mom and pop health food stores." (Doc. # 69-5, 21:11-14).

---

[2] Plaintiff has enhanced its products with pea protein since 2014. (Doc. # 69-5, 30:19-31:19). Prior to that, Plaintiff enhanced its products with soy protein. (*Id.*)

[3] Defendant started out producing peanut butter, chocolate peanut butter, almond butter, and chocolate almond butter. (Doc. # 69-1, 8:1-13). By 2014, Defendant also offered pumpkin spice, cookie butter, salted caramel, sesame cranbutter, toffee crunch, white chocolate, and cinnamon raisin nut butters. (Doc. # 69-1, 133:1.5-14; 143:7).

In fall of 2012, Plaintiff recalled all of its products due to salmonella contamination at one of its manufacturers' facilities. (Doc. # 69-5, 47:5-49:8). Plaintiff did not resume selling its products for several months after the recall while it looked for a new manufacturer for its products. (Doc. # 69-5, 47:5-49:13). In November 2012, Plaintiff began using a new manufacturer; however, that manufacturer could not accommodate Plaintiff's previous jar size and Plaintiff thus could not fill orders immediately. (Doc # 69-5, 23:12-23).

In March 2013, Defendant appeared on the network television show *Shark Tank*. (Doc. # 93-8 at ¶ 3). On the show, representatives of Defendant made a pitch to prospective investors with the hope of obtaining investors. (Doc. # 93-8 at ¶ 3; Doc. # 36 at p. 11). As part of their pitch, Defendant's representatives touted its nut butters as containing 14 grams of protein per serving. (Doc. #36 at p. 11). Defendant ultimately obtained capital from two of the investors on the show, and Defendant has since appeared in two of the show's follow-up episodes. [4] (Doc. #36 at p.12).

Also in March 2013, Plaintiff became dubious of Defendant's protein content claims. (Doc. #36 at p.12). Doubting that Defendant's products contained 14 grams of protein per serving, Plaintiff sent a sample of Defendant's peanut butter product to an independent lab to test the product's protein content. (Doc. # 94-1). Plaintiff provided evidence of seven lab test reports of the protein content of twenty-one of Defendant's products dated between April 5, 2013 and May 21, 2015. (Doc. # 69-11 at p. 67). All the tests conducted during the relevant time period (*i.e.*, the period during which Defendant marketed its products as containing 14 grams of protein per serving) purport to indicate a protein content less than eighty percent of the amount of protein actually claimed by Defendant's labels and advertising. (Doc. # 69-11 at p. 67).

---

[4] Defendant's follow up appearances on episodes of the television show *Shark Tank* aired in 2014 and 2015. (Doc. 93-8 at ¶ 3)

In 2014, Plaintiff switched manufacturers again. (Doc. # 69-5, 124:9-125:3). As a result of this switch, Plaintiff changed the protein source of its products from soy to pea protein. (Doc. # 69-5, 30:19-31:19).

Notably, until 2014, Defendants marketed their products as containing 14 grams of protein per serving. (Doc # 36 at ¶16 n. 2; Doc # 91-5 at 28:4-8). In fact, Defendant's products featured the claim "14 grams of protein" on their nutrition labels. (Doc. # 36 at ¶ 23). Further, the principal display panels on Defendant's products, which are packaged in individual jars, stated in bold font that they contained "14 grams of protein" in addition to making other nutrient content claims. (Doc. # 36 at ¶¶ 19, 21). Defendant's marketing efforts repeated the claim that its products contained 14 grams of protein per serving. (*Id.*)

In 2014, Defendant reformulated its products. (Doc. # 69-1, 98:10-15). Following this reformulation, Defendant changed its labeling and advertising to reflect its products' new protein content (twelve grams of protein content instead of fourteen), as well as new carbohydrate and fiber content. (*Id.*; Doc. # 91-5 at 28:4-8).

## III. Procedural History

### A. Plaintiff's Amended Pleadings

Plaintiff filed this lawsuit on September 2, 2014. (Doc. # 1). Plaintiff's original Complaint contained a claim for False Advertising under the Lanham Act and a claim for relief under Alabama Code § 8-19-2 ("Alabama Deceptive Trade Practices Act"). Upon mutual agreement of the parties, the court dismissed with prejudice the Alabama Deceptive Trade Practices Act claim, and allowed Plaintiff to replead its Lanham Act claim. (Doc. # 30). Plaintiff then filed an amended complaint. (Doc. #31). The amended complaint was followed by

a second amended complaint (Doc. # 36), in which Plaintiff alleged that it lost business as a result of Defendant's alleged misrepresentations.

**B.    Defendant's Motion to Exclude Testimony of Robert Robicheaux**

Defendant has moved to exclude the testimony of Dr. Robert Robicheaux (Doc. # 57), arguing that Dr. Robicheaux's methodology is not reliable, his opinion that Defendant and Plaintiff are direct competitors is not supported, his opinion that protein content is the "determinant attribute" in buyers' decision-making is unreliable, his opinion that Plaintiff's sales were adversely affected by Defendant's protein content claim is unsupported, he is not qualified to testify regarding his opinions about consumer behavior, and his testimony that Defendant's protein content claims were false is inadmissible and should be excluded. (Doc. # 57).

Dr. Robicheaux addressed three issues in his report and subsequent deposition: (1) whether Defendant made false or misleading statements in commercial advertisement about its products; (2) whether those statements deceived or had the capacity to deceive a substantial segment of potential consumers; and (3) whether the deception caused by the statements was material because it was likely to have influenced consumers to decide to purchase Defendant's products instead of Plaintiff's products.  (Doc. # 69-11 at p. 52).

In making his determinations, Dr. Robicheaux spoke to employees at two GNC stores in Birmingham, Alabama and reviewed email messages sent to a representative of Defendant. (Doc. # 69-11 at p. 55). Dr. Robicheaux further conducted internet research to determine the benefits of a high protein diet, and to learn more about the target customers of Defendant's products.  (*Id.*) It was from his interviews and data collection that Dr. Robicheaux reached his conclusion regarding what the "market" is for Defendant's products and its competitor's products.  (Doc. # 69-11 at p. 55-56).

Dr. Robicheaux's expert report addressed the market for high protein nut butters, and the benefits buyers of such products seek. (Doc. # 69-11 at p. 55). His report detailed the market for peanut butter in the United States, including the market shares of the four major sellers of mass marketed peanut butter spreads.[5] (Doc. # 69-11 at p. 60-61). His report further detailed the factors that differentiate the high protein nut butter market from the "traditional" nut butter market. (Doc. # 69-11 at p. 62). Dr. Robicheaux concluded that the determinant attribute for potential buyers of high protein nut butters is protein content, and that Defendant's alleged misrepresentation of its products' protein content was thus likely to materially deceive potential customer. (Doc. # 69-11 at p. 63-64). Dr. Robicheaux concluded his report by stating that "[a] significant share of Defendant's sales are coming at the expense of high-protein content nut butter sellers who have not claimed protein content beyond what is factual," and "Plaintiff's sales have been adversely affected." (Doc. # 69-11 at p. 71).

## IV. Standards of Review

### A. *Daubert* and Rule 702

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, and *Daubert* and its progeny. Federal Rule of Evidence 702 provides for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), the Supreme Court held that scientific expert testimony is admissible only if the proffered testimony is both relevant and reliable. "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting

---

[5] Dr. Robicheaux notes that the peanut butter industry is very concentrated, with 83% of all peanut butter sales going to Smucker's Jif, Hormel's Skippy, ConAgra's Peter Pan and Great Value, and Hershey's Reece's. (Doc. # 69-11 at p. 61). He further observed that Defendant is not in competition with these "giant consumer packaged goods companies", but instead competes in the limited high protein nut butter market. (Doc. # 69-11 at p. 62). Notably, Dr. Robicheaux did not conduct a similar analysis of the high protein nut butter industry. He did not calculate Plaintiff's market share nor research any of the other competitors in the high protein nut butter industry. (Doc. # 69-11, 77:12-16; 123:9-13; 15:10-14; 45:18-46:3).

such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corporation*, 269 F.3d 865, 869 (7th Cir. 2001); *see also U.S. v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[6]

Accordingly, under Rule 702, "this [c]ourt has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts." *Whatley v. Merit Distribution Services*, 166 F.Supp.2d 1350, 1353 (S.D. Ala. 2001) (citations omitted).

While the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95; *see McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (recognizing a trial judge "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate"). "But conclusions and methodology are not entirely distinct from one another"; neither *Daubert* nor Federal Rule of Evidence 702 requires a trial judge "to admit opinion

---

[6] Rule 702 was amended in 2011. According to the advisory committee notes (2011 Amendments) to Rule 702, "[t]he language of Rule 702 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility."

evidence that is connected to existing data only by the *ipse dixit*[7] of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

To aid in determining reliability under Rule 702, courts look to the non-exclusive factors set forth in *Daubert*:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Daubert*, 509 U.S. at 592-95); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999) ("[*Daubert's*] list of factors was meant to be helpful, not definitive."). Under *Daubert*, "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." Fed. R. Evid. 702 advisory committee's notes (2000 Amendments) (citations omitted). The notes to Rule 702 make clear that "[n]othing in [Rule 702] is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony." *Id.* The Rule "expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.* But, "[a]s gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Chapman v. Procter & Gamble Distributing, LLC,* 766 F.3d 1296, 1306 (11th Cir. 2014) (quoting *Kilpatrick v. Breg, Inc*., 613 F.3d 1329, 1335 (11th Cir. 2010)).

---

[7] From the Latin, this phrase is translated "he himself said it." An *ipse dixit* statement is one which is unsupported and rests solely on the authority of the individual who makes it. *See* http://thelawdictionary.org.

"[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct," but must establish "by a preponderance of the evidence, it is reliable." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). An expert's failure to satisfy any of the four reliability factors recognized in *Daubert* is sufficient to preclude the testimony of an expert from testifying at trial. *Daubert*, 509 U.S. at 593–94.

### B. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine, "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc.*, teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477

U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## V. Analysis

After careful review, the court concludes that (1) Dr. Robicheaux's proffered opinion is due to be excluded because it is unreliable and not supported by a reliable methodology, (2) Mr. Lovoy's proffered opinion suffers from the same fatal flaws, and (3) Defendant's Motion for Summary Judgment is due to be granted. The court addresses each of these issues in turn.

### A. Dr. Robicheaux's Opinion that Defendant's Alleged False Advertisement Caused Plaintiff's Injuries is Unreliable and is Not Supported by a Reliable Methodology

Defendant argues that Dr. Robicheaux's opinion that Plaintiff's sales were adversely affected by Defendant's alleged misrepresentation is not supported by facts or reliable methodology. (Doc. # 89 at p. 5). Defendant further argues that Dr. Robicheaux's testimony regarding the cause of plaintiff's injuries should be excluded because, in defining the "market" for Defendant's products, he did not speak to any customers, conduct customer surveys, conduct focus groups, or interview any authorized representative of Defendant's distributors or retailers. (Doc. # 89 at p. 6). Additionally, Defendant contends that Dr. Robicheaux failed to account for additional variables (besides Defendant's protein claims) that may have affected the parties' sales positions. (Doc. # 89 at p. 15). The court agrees.

In *IQ Products Co. v. Pennzoil Products Co.*, 305 F.3d 368 (5th Cir. 2002), both of the parties manufactured competing tire inflation products, and the plaintiff alleged that the defendant failed to label its "Fix-A-Flat" product as "flammable." *Id.* at 370. After receiving a magistrate judge's recommendation, the district judge excluded the plaintiff's two witnesses who

would have testified as to the effect of the defendants' allegedly false statements because the experts' opinions were based on "insufficient data" and "unreliable methodology". *Id*. at 376. The court found that the experts "did not conduct any market or survey research or [provide] any data that could be subject to testing and verification." *Id*. The court excluded testimony that customers would have purchased plaintiff's products instead of defendant's products, because that opinion was supported only by "common sense", and not market research or other tests. *Id*. The Fifth Circuit upheld both the exclusion of the experts on this basis as well as the grant of summary judgment. *Id*. at 377, 378.

Similarly, in *3M Innovative Properties Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958 (D. Minn. 2005), the court noted that the plaintiff's expert calculated "damages after assuming that the false advertising caused [the plaintiff's] lost profits," and that that alone did not provide any insight into, much less evidence of, causation. *Id*. at 973. The court granted summary judgment in part because the plaintiff's expert failed to "link" the change in the parties' sales positions to the defendant's advertising claims. *Id*. In particular, the court found that "assumption or belief that lost sales can be attributed to [Defendant]'s advertising generally…. is an insufficient evidentiary basis on which to avoid summary judgment." *Id*.

Here, in his expert report and deposition, Dr. Robicheaux predominately focused on the nut butter market and the defining attributes of specialty nut butters. He has opined that consumers chose Defendant's products over Plaintiff's products because of Defendant's alleged false advertising. (Doc. #69-11 at p. 71). A review of the record evidence, however, demonstrates that Dr. Robicheaux's opinion testimony is wholly conclusory, and lacks the methodology and support necessary to be helpful to a jury.

Dr. Robicheaux has not performed any significant analysis "linking" Defendant's alleged misrepresentations to Plaintiff's lost profits, and as such his methodology fails to produce sufficient reliable information regarding causation. While he studied the market for Defendant's products, he has made no attempt to analyze Plaintiff's marketing strategy or its target customers. Dr. Robicheaux's opinion that Defendant's alleged false advertising caused Plaintiff's injury is based on comparison of the parties and the likelihood of injury, but his expert report and deposition testimony fail to analyze the market for Plaintiff's products.

The court in *IQ Products Co.* excluded similar testimony of an expert who opined that consumers would have purchased plaintiff's product instead of defendant's product because the expert failed to conduct reliable survey or market research. 305 F.3d at 376. While this is not the only type of evidence that would support a finding of causation, it is notable that Dr. Robicheaux did not perform any kind of consumer study to determine the impact, if any, Defendant's alleged false advertising had on Plaintiff's sales. In a setting like this, in order to testify regarding causation, an expert must present some evidence that Defendant's alleged misrepresentations caused Plaintiff to lose sales. *See, e.g. Trilink Saw Chain, LLC v. Blount, Inc.,* 583 F.Supp.2d 1293 (N.D. Ga. 2008). Such testimony requires the expert to demonstrate both that consumers chose Defendant's products over Plaintiff's products, *and* that consumers' choices were connected to Defendant's false advertising. Such a conclusion requires more than an examination of the market for Defendant's products and an explanation of the purportedly false protein claims.

Dr. Robicheaux's conclusion that Defendant's alleged false advertisement caused Plaintiff's loss in sales is further problematic because it fails to take into account other relevant factors related to the parties' sales positions. In a Lanham Act false advertising case, a causation

expert need not exclude every possible alternative cause of a plaintiff's injury; however, in order to provide reliable testimony an expert must take into account most relevant factors as to causation. *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 442 (D.N.J. 2009) (finding an expert's testimony regarding causation unreliable where the expert did not undertake a systematic analysis to determine the specific effect of any piece of advertising, and failed to analyze most relevant factors as to causation.).

Notably, Defendant appeared on the NBC show *Shark Tank* and multiple follow up television shows. Dr. Robicheaux did not take this important factor into account when analyzing why consumers may have chosen Defendant's products. Further, even if the court assumes that consumers purchased Defendant's products due to the alleged false advertising,[8] Dr. Robicheaux nonetheless failed to account for Plaintiff's independent financial troubles when assuming Defendant's alleged false advertisement caused Plaintiff's loss of sales. In 2012, Plaintiff's products were recalled due to salmonella contamination in a manufacturer's plant, and Plaintiff later switched manufacturers and protein content additive several times. These changes caused Plaintiff financial hardship, and Dr. Robicheaux's assumption that all of Plaintiff's sales losses since 2012 are attributable to Defendant's alleged false advertising is thus unlikely.

Dr. Robicheaux's proposed testimony appears to ably address three of the four elements necessary to establish a false advertising claim under the Lanham Act.[9] However, his proposed

---

[8] If the factfinder determines that Defendant's advertisement was literally false (as opposed to being true but misleading), it may assume that consumers were deceived, and a plaintiff-competitor need not present evidence of consumer deception. *See Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.,* 299 F.3d 1242, 1247 (11th Cir. 2002).

[9] As mentioned above, Dr. Robicheaux's report addressed (1) whether defendant made false or misleading statements in commercial advertisement about its products, (2) whether those statements deceived or had the capacity to deceive a substantial segment of potential consumers, and (3) whether the deception caused by the statements was material because it was likely to have influenced consumers to decide to purchase Defendant's products instead of Plaintiff's products.

testimony that Defendant's alleged misrepresentations caused Plaintiff's damages is due to be stricken, as it is unsupported by sufficient data or reliable methodology.

### B.    Defendant's Motion to Exclude Testimony of Steve P. Lovoy, Jr.

Defendant has also moved to exclude Steve P. Lovoy, Jr.'s testimony (Doc. # 57), arguing that Mr. Lovoy, a Certified Public Accountant with professional experience performing audit and consulting services, is not qualified to testify regarding causation and that his opinion that Defendant's alleged false advertising caused Plaintiff to lose market share is excludable. The court agrees and concludes that Defendant's Motion is due to be granted in part.

Mr. Lovoy's expert report (1) compares the Parties' sales revenues and (2) contends that Defendant's alleged false advertising caused Plaintiff to lose market share. (Doc. # 69-10 at p. 91-95).  While it is unclear from Mr. Lovoy's expert report and deposition whether he intended to testify as to the cause of Plaintiff's alleged damages,[10] the evidence submitted by the parties establishes that Mr. Lovoy is not qualified to testify regarding the cause of Plaintiff's injury.

Mr. Lovoy's expert report provides a summary of both parties' sales revenues from 2012 to June 2015. (Doc. # 69-10 at p. 93).  Mr. Lovoy created this summary from information contained in the Parties' accounting records, as well as the deposition testimony of each party's representatives and financial statements provided by both of the Parties. (Doc. # 69-10 at p. 100).

Mr. Lovoy further provided a calculation of damages in his report. (Doc. # 69-10 at p. 94-95).  Mr. Lovoy determined that Plaintiff lost $2.6 million in sales as a result of Defendant's false advertising. (Doc. # 69-10, 17:4-8).  Mr. Lovoy described his methodology as follows:

---

[10] Mr. Lovoy stated in his report that that he was retained "to evaluate and render opinions regarding [Plaintiff's] economic damages assuming a finding of liability against [Defendant] in this matter." (Doc. # 69-10 at 91).  When asked in his deposition if he was "rendering a causation opinion" in this case, Mr. Lovoy answered, "No, I don't think that's what I am doing." (Doc. # 69-10, 40:1-4).  However, Mr. Lovoy later testified in his deposition that Plaintiff suffered financial harm as a result of Defendant's alleged false advertising. (Doc. # 69-10, 160:8-15).

> After the review that I described of [Plaintiff's] records and review of the testimony and all of the other documents that I've looked at, any decline that I could associate with another intervening cause I have accounted for. And I'm left with the 2.6 million that we are talking about now for which… I am unable to identify another cause other than the allegations and… the loss of market share in Dr. Robicheaux's report that is taken from [Plaintiff] by [Defendant].

(Doc. # 69-10, 24:14-25:6).

Mr. Lovoy further believes that Defendant's alleged false advertising resulted in a $6.7 million in profits for Defendant. (Doc. # 69-10 at p. 94). He has further opined which of Defendant's sales were related to the alleged false advertising in a similar fashion. In describing his methodology, "I looked at… when the [14 grams of protein] claims were made and then accounted for the sales during that time – during the time period which those claims were in the market". (Doc. # 69-10, 138:21-139:7).

1. **Mr. Lovoy's Opinion that Defendant's Alleged False Advertising Caused Plaintiff's Injuries is Unreliable and is Not Supported by a Reliable Methodology**

The court concludes that Mr. Lovoy's testimony regarding the cause of Plaintiff's financial injury is not based on sufficient facts or data and is not a product of reliable principles and methods. Mr. Lovoy's methodology simply involved calculating all of Plaintiff's sales declines following 2012, and then reducing that amount by sales of any product Plaintiff's representative admitted in his deposition were not directly affected by Defendant's presence in the nut butter market. (Doc. # 69-10, 101:1-5).

In assessing possible causes of Plaintiff's financial harm, Mr. Lovoy's methodology analyzed only the parties' financial records, and did not consider any of a number of potential outside sources that may have affected Plaintiff's sales. (Doc. # 69-10, 137:7-10). Mr. Lovoy did not analyze the total nut butter market size or Plaintiff's share of that market. (Doc. # 69-10,

30:7-32:2). He did not analyze the effect Plaintiff's salmonella recall had on its sales[11] or any consumer sales trends prior to 2012. (Doc. # 69-10, 129:8-21; 131:2-8; 97:23-98:5). In making his determination, Mr. Lovoy did not interview any of Plaintiff's customers (Doc. # 69-10, 61:17-19), and admitted that he cannot otherwise determine why a particular customer would choose to buy less from Plaintiff. (Doc. # 69-10, 91:1-7).

Notably, in a Lanham Act false advertising case, there is a heightened risk associated with causation testimony that ignores the competitive market as a whole. *3M Innovative Props, Co.*, 361 F. Supp. 2d at 972. ("In a suit for money damages where a defendant misrepresented its own product but did not specifically target a competing product, plaintiff may only be one of many competitors, and without proof of causation and specific injury each competitor might receive a windfall unrelated to its damage."). Further, as mentioned above, an expert's testimony regarding causation is not reliable when the expert fails to take into account numerous other factors relevant to the cause of Plaintiff's alleged injury. *Bracco Diagnostics, Inc.*, 627 F. Supp. at 442.

Mr. Lovoy's proposed testimony that Defendant's advertising caused Plaintiff's injuries relies merely on assumptions. As such, Mr. Lovoy's methodology for establishing causation is unreliable. While Mr. Lovoy assumed that a causal connection existed between Defendant's alleged false statements and Plaintiff's damages, he provided no data to support such a conclusion, and failed to account for other relevant factors affecting Plaintiff's sales.

---

[11] Mr. Lovoy mentioned the recall in his expert report, and stated that because the recall caused a temporary loss in sales volume, Defendant's profits, not Plaintiff's lost sales, should be used as a benchmark for calculating damages. (Doc. # 69-10, p. 94). While this may be the case, Mr. Lovoy made no attempt to determine or calculate which of Plaintiff's lost sales were attributable to the recall and which lost sales were attributable to Defendant's alleged false advertising.

## C.     Defendant's Motion for Summary Judgment is Due to be Granted

Defendant has also moved for summary judgment in this case (Doc. # 56), arguing that Plaintiff cannot put forth sufficient evidence on the key issue of causation.[12]  Defendant further argues that Plaintiff and Defendant are not direct competitors, and that Plaintiff's lack of evidence establishing causation deprives Plaintiff of standing.

Under the Lanham Act, a plaintiff can recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  15 U.S.C. §1117(a).  The elements of a false advertising claim under the Lanham Act are:

> (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising.

*Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.,* 299 F.3d 1242, 1247 (11th Cir.2002).

Notably, "[t]he final element of a Lanham Act false advertising claim is that the false advertising caused injury to plaintiff." *Air Turbine Tech., Inc. v. Atlas Copco AB*, 295 F. Supp. 2d 1334, 1344 (S.D. Fla. 2003); *see also Trilink Saw Chain, LLC v. Blount, Inc.,* 583 F.Supp.2d 1293, 1320 (N.D. Ga. 2008) ("[T]he plaintiff must demonstrate that the false advertisement actually deceived or misled consumers, which in turn caused injury to the plaintiff."). This "causation" element can be established when the movant provides evidence linking the false advertisement to consumers' decisions not to purchase the movant's product.[13] *See Ameritox,*

---

[12]  In its Motion for Summary Judgment, Defendant does not contest that Plaintiff provided sufficient Rule 56 evidence for the other elements that Plaintiff is required to establish to make out a Lanham Act claim.

[13]  The court notes that courts may also presume causation where a defendant engages in deceptive comparative advertising (*i.e.*, advertising that occurs when a competitor directly compares its products with a plaintiff's products). *Trilink Saw Chain, LLC v. Blount, Inc.,* 583 F.Supp.2d 1293, 1321 (N.D. Ga. 2008).  In this case, there is no allegation that Defendant compared its products to Plaintiff's products.  Instead, Plaintiff contends that Defendant misrepresented the protein content of its own products.

*Ltd. v. Millennium Labs., Inc.*, 2014 WL 1456347, at *8 (M.D. Fla. Apr. 14, 2014) (finding that causation of actual damages cannot be shown simply by evidence that one party began missing financial projections while the alleged offending party began exceeding sales projections).

When a false advertisement is literally false, rather than being literally true but misleading, the court may presume that consumer deception occurred, and a plaintiff need not present evidence of consumer deception. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). However, even where a defendant's statements are literally false and the court presumes consumer deception, a plaintiff must still prove that the alleged false advertising caused the asserted damages (here, that consumers chose Defendant's products rather than those of Plaintiff). *See PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 122 (4th Cir. 2011).

As discussed below, Plaintiff has not provided sufficient Rule 56 evidence establishing that Defendant's actions caused its injuries. Therefore, this opinion addresses causation (rather than standing) and the proximate cause inquiry.[14]

---

[14] The court does note that in addition to actual damages and disgorgement of Defendant's profits, Plaintiff seeks injunctive relief. More specifically, Plaintiff's Second Amended Complaint seeks injunctive relief prohibiting Defendant from engaging in ongoing false advertising, requiring Defendant to remove all false advertising, and requiring corrective advertising to remedy the effects of Defendant's advertising. (Doc. #36 at p. 19).

"[T]o have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that [it] will be affected by the allegedly unlawful conduct in the future." *Wooden v. Bd. Of Regents of Univ. Sys. Of Ga.*, 247 F.3d 1262, 1283 (11th Cir. 2001); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief… if unaccompanied by any continuing, present adverse effects.").

Plaintiff's Second Amended Complaint contends that Defendant falsely advertised its products by claiming they contained 14 grams of protein per serving. (Doc. #36 at ¶¶ 20-23). The uncontradicted Rule 56 evidence establishes that Defendant reformulated its products in 2014, and changed its labeling to reflect a protein content of 12 grams of protein per serving. (Doc. # 69-5, 47:3-20). No evidence has been presented that Defendant has advertised its products as containing 14 grams of protein since the 2014 labeling change. As such, the court finds that a grant of injunctive relief would be improper in this case.

**1. Plaintiff Has Provided Sufficient Rule 56 Evidence Creating a Genuine Issue of Material Fact as to Whether Plaintiff and Defendant are Direct Competitors**

Defendant argues that Plaintiff cannot establish causation in part because Defendant and Plaintiff are not direct competitors. (Doc. # 88 at p. 13). Defendant asserts that it is undisputed on this record that the parties' products have different nutritional profiles and are sold in different flavors and argues that Defendants' nut butters are not capable substitutes for Plaintiff's, and vice versa. (Doc. # 88 at p. 17). Defendant further argues that the Rule 56 evidence shows that the parties' have different marketing efforts and strategies, and this indicates that they are not direct competitors. (Doc. # 88 at p.16). The court disagrees.

First, there is no requirement that a plaintiff prove that it is a direct competitor with a defendant in order to succeed on a Lanham Act false advertising case. *See*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014) (rejecting a test that would provide standing under the Lanham Act only to direct competitors of the defendant). Nonetheless, Defendant argues that the differences between Plaintiff and Defendant are so vast that they are vying for different consumers and markets, and therefore no action of Defendant could have harmed Plaintiff.

The Rule 56 evidence establishes that Plaintiff and Defendant both sell premium nut butter products which are distinguishable from "traditional" nut butters based on their purported health benefits and increased protein content. Further, while the parties market their products differently, those products are all available at stores that sell products intended to promote healthy living. Of course, this is not to say that certain specific consumers may not compare and qualitatively (or quantitatively) consider these respective products as distinct while they are making particularized purchasing decisions. But, on the whole, the record indicates that there is

a question of disputed fact as to whether the parties are direct competitors, and a grant of summary judgment based solely on the differences between the parties would be improper.

## 2. Plaintiff Has Not Provided Rule 56 Evidence Establishing Causation as an Element of a Lanham Act Claim.

Although there is sufficient evidence that Plaintiff and Defendant compete (as Plaintiff alleges), the same cannot be said with respect to the key element of causation in this case.

### a. Lost Profits

As mentioned above, Plaintiff seeks relief in the form of recovery of its lost profits. (Doc. #36). When a plaintiff claims damages in lost profits, it must establish that it actually lost sales as a result of the false advertisement. *See William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255 (9th Cir. 1995); *Labware, Inc. v. Thermo Labsystems, Inc.*, 2005 WL 1541028, at *12 (E.D. Pa. June 29, 2005) (granting summary judgment and finding that "[a]ctual damages cannot exist without a nexus between a false advertisement and an adverse purchasing decision.").

The evidence that Plaintiff and its experts have presented is simply not sufficient for a trier of fact to find causation (*i.e.*, that Defendant's alleged false advertisement caused Plaintiff to lose sales) under the Lanham Act. [15] As addressed above, Dr. Robicheaux and Mr. Lovoy

---

[15] The court finds it significant that, in its Response in Opposition to Defendant's Motion for Summary Judgment, Plaintiff said of its failure to address the issue of causation independently: "Plaintiff has never addressed the issue of proximate cause independently, as it was the Plaintiff's opinion Proximate Cause was so intuitive and asserted through other issues." (Doc. #76 at p. 25-26). Plaintiff argues that evidence supports a finding that Defendant's protein content claims were literally false, and as such injury in fact and causation may be assumed. (Doc. #78 at p.14).

As mentioned above, once a court deems an advertisement to be literally false (as opposed to being literally true, but misleading), the court may presume that consumer deception occurred, and the movant need not present actual evidence of consumer deception. *Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1247. This presumption applies to consumer deception claims (*i.e.*, the assertion that consumers were deceived by Defendant's protein content claims); however, it does not allow a claimant to wholly ignore causation.

Causation may only be presumed in limited instances. Courts presume causation and financial harm when a defendant uses comparative advertising, and directly compares its product to the plaintiff's product. See, *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008). Similarly, courts may presume that a defendant's actions caused a plaintiff's injuries in "two-player market" cases as well as cases involving trademark infringement. See, *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 259-60 (2d Cir. 2014); *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018 (11th Cir. 1989).

have not provided reliable testimony regarding causation, and their testimony on the issue is due to be stricken.  But, even if this were not the case, and the court were to consider their testimony (and, to be sure, the court has found their testimony is inadmissible) there would still be no genuine issue of material fact regarding causation in this case.

The evidence Plaintiff has presented details the purported false advertising, as well as the characteristics of the parties' and the products they sell.  Regarding the element of causation, Plaintiff largely relies on circumstantial evidence and the assumption, based on the similarities of the parties' products and the claims Defendant made in its advertising, that consumers chose Defendant's products over Plaintff's products based on Defendant's advertising.  Plaintiff has presented Rule 56 evidence suggesting that both Defendant and Plaintiff sell high protein nut butters, which are further fortified to appeal to health-conscious consumers.  (Doc. # 69-1, 25:3-18, 96:10-15; Doc. # 69-5, 29:11-30:21).  Plaintiff has further presented record evidence suggesting that Defendant advertised its products as containing 14 grams of protein per serving, when in fact they did not.  (Doc. # 65-1, 60:5-15).  Plaintiff also presented Rule 56 evidence that over the time period in question, Plaintiff suffered a decrease in sales figures while Defendant's sales increased.  (Doc. # 69-10, Appendices 1-3).

However, this alone is not sufficient to support a finding that Defendant's alleged false advertising was the cause of Plaintiff's injury here.  This is because what is missing is any evidence connecting a misrepresentation by Defendant to the drop in Plaintiff's sales.  In order to survive summary judgment, a plaintiff must provide substantial evidence not just that Plaintiff suffered damages, but that those damages were caused by Defendant's alleged false

---

The present case does not fit into one of the above categories, and Plaintiff has presented no evidence suggesting that the court should presume that Defendant's alleged false statements caused Plaintiff's injury.

advertisement. *See Air Turbine Tech., Inc.* F. Supp. 2d at 1344; *Synygy v. Scott-Levin*, 51 F. Supp. 2d 570, 577 (E.D. Pa. 1999).

In this case, Defendant has presented evidence that Plaintiff's injuries were not caused by Defendant's alleged false advertisements, and instead any lost profits Plaintiff suffered were caused by other factors. (Doc. # 69-5, 23:12-23, 47:5-49:8, 122:20-124:8; Doc. # 69-10). As such, Rule 56(c) requires Plaintiff to go beyond the pleadings and designate specific facts showing that there is such a nexus and therefore a genuine issue for a jury on the issue of causation. *See Celotex*, 477 U.S. at 324. But, here, Plaintiff has put forth no summary judgment evidence indicating there is a nexus between the alleged false advertising and Plaintiff's loss of sales. Indeed, Plaintiff presented no Rule 56 evidence that a single consumer chose to buy Defendant's products instead of Plaintiff's products because of Defendant's alleged false advertisement. *See Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958) (noting that while the plaintiff need not prove every single buyer who was diverted to the false advertising competitor, plaintiff must make an evidentiary showing of some diverted sales). And, of equal importance, Plaintiff's evidence fails to account for other relevant factors that may have influenced Plaintiff's sales besides the alleged false advertisement. Both Plaintiff's representative and Dr. Robicheaux admit that there are a number of product attributes, not just a product's purported protein content, that influence buyers' decisions. (Doc. # 69-5, 96:23-97:5; Doc. # 69-11, 97:19-21).

Thus, a simple comparison of the Parties' respective sales positions alone does not establish that Defendant's alleged false advertising caused Plaintiff's injury. But that is all Plaintiff has done here. In contending that its lost sales are attributable to Defendant's alleged false advertisement, Plaintiff has not accounted for alternative reasons for Defendant's growth or

alternative justifications for Plaintiff's losses. Both Plaintiff's owner and Dr. Robicheaux conceded that Defendant's appearance on the television show *Shark Tank* would have a positive impact on Defendant's marketing. (Doc. # 69-5, 98:6-9; Doc. # 69-11, 123:15-21).

Similarly, Plaintiff's assumption of causation fails to account for other factors besides Defendant's alleged false advertising that may have impacted Plaintiff's sales. The Rule 56 evidence indicates that during the relevant time period, Plaintiff experienced a decline in sales with respect to certain customers who never stocked Defendant's products. (Doc. # 69-5, 124:9-124:17). Further, Plaintiff recalled its products in 2012 due to a salmonella contamination at one of its manufacturers' plants. (Doc. # 69-5, 47:5-49:13). This recall required Plaintiff to stopping selling its products for several months, which resulted in further lost sales for Plaintiff. (Doc. # 69-5, 47:5-49:13). Of course, Plaintiff need not exclude every possible reason it lost sales in order to establish causation. However, Plaintiff's failure to provide evidence excluding other reasons for its lost sales is problematic, particularly given the limited evidence it provides to establish causation.

For the foregoing reasons, the court finds that Defendant's Motion for Summary Judgment is due to be granted as to Plaintiff's request for actual damages.

### b. Disgorgement of Defendant's Profits

Plaintiff further seeks disgorgement of Defendant's profits. (Doc. # 36). In its Motion for Summary Judgment, Plaintiff contends that in order to obtain a disgorgement of Defendant's profits, Plaintiff need only prove Defendant's gross sales, after which the burden shifts to Defendant to prove which of its sales were not due to the alleged false advertisements.

In a Lanham Act case, an award of a defendant's profits is "appropriate where: (1) the defendant's conduct was willful and deliberate; (2) the defendant was unjustly enriched; or (3) it

is necessary to deter future conduct." *Optimum Technologies, Inc. v. Home Depot, U.S.A., Inc.*, 217 Fed.Appx. 899, 902 (11th Cir. 2007). Further, "in assessing profits[,] the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988).

While this is the case, a plaintiff is not entitled to disgorgement until the plaintiff has proved causation. *Ameritox, Ltd. v. Millennium Labs., Inc.*, 2014 WL 1456347, at *9 (M.D. Fla. Apr. 14, 2014). As such, a plaintiff is only entitled to apportionment of a defendant's profits after providing evidence to establish that the alleged false advertising caused some injury to the plaintiff. *Id.*, citing *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F. Supp. 2d 357, 362 (E.D.N.Y. 2010) (Reasoning that a plaintiff cannot obtain an accounting of profits when the plaintiff cannot demonstrate an injury caused by defendant's actions).[16]

**D.    There is a Substantial Question as to Whether Plaintiff Lacks Standing to Assert its Lanham Act Claim.**

Finally, in addition to proving the above-listed elements, a plaintiff must demonstrate, as an initial matter, that it has standing to assert a false advertising claim under the Lanham Act. The Supreme Court has adopted a two part test for determining "statutory" standing in Lanham Act cases. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388-89 (2014). First, a plaintiff must demonstrate that his interests "fall within the zone of interests protected by the law invoked." *Id.* at 1388. (internal citation omitted). Under the Lanham Act, this means that a plaintiff "must allege an injury to a commercial interest in reputation or sales" in order to fall within the statutory zone of interests. *Id.* at 1389. Second, in order to have standing, a plaintiff must demonstrate that its injuries were proximately caused by violations of

---

[16] *See Burdy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir. 1984) (finding that an order for accounting is typically "limited to situations in which the defendant's profits represent unjust enrichment derived from diversion of business that clearly would otherwise have gone to the plaintiff.").

the Lanham Act. *Id*. at 1390. This second showing requires a demonstration that the harm alleged has a sufficiently close connection to the conduct the statute prohibits. *Id*. To establish proximate cause, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id*. at 1391.

Notably, when standing is raised at the summary judgment stage (rather than on a motion to dismiss), a plaintiff cannot rest on "mere allegations," but instead must set forth specific Rule 56 evidence establishing standing. *Bischoff v. Osceola Cty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). Even in a standing analysis, disputed facts must be construed in the light most favorable to the plaintiff. *Id*.

As mentioned above, Plaintiff has not provided evidence that Defendant's alleged false advertising caused injury to Plaintiff. The court notes that (1) "a direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue" in a Lanham Act case and (2) a plaintiff must "ordinarily show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising" in order to have standing. *Lexmark Int'l, Inc.*, 134 S. Ct. at 1391. The parties have not provided, and the court has not located, any Eleventh Circuit case discussing whether the factual showing required to support proximate causation at summary judgment is the same or similar to the factual showing required to support causation. Without intending to conflate the two, the court notes that at a minimum *Lexmark International, Inc.* requires that, at the summary judgment stage, a plaintiff must provide some evidence from which a reasonable juror could conclude that its injuries were proximately caused by the defendant. *See Paleteria La Michoacana, Inc. v.*

*Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 216 (D.D.C. 2014), *reconsideration denied*, 79 F. Supp. 3d 60 (D.D.C. 2015).  Plaintiff has provided no such evidence and is not entitled to relief under the Lanham Act.[17]

## VI. Conclusion

For all these reasons, Defendant's Motion for Summary Judgment (Doc. # 56) is due to be granted.  The court finds that no genuine issues of material fact remain for trial as to Plaintiff's claims and the relief that Plaintiff seeks, and that Defendant is entitled to judgment as a matter of law.  Accordingly, Plaintiff's Motion to Strike Helen McDaniel as Expert Witness (Doc. # 49), Motion to Exclude Trial Testimony of Michael R. Solomon, Ph.D. as Expert Witness (Doc. # 61), and Motion for Summary Judgment (Doc. # 97) are moot.  The court will enter an order contemporaneously herewith granting Defendant's Motion for summary judgment.

**DONE** and **ORDERED** this November 16, 2016.

_____
R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

[17]  This is especially the case with regard to Plaintiff's request for disgorgement of Defendant's profits. While Plaintiff cites pre-*Lexmark* caselaw for the proposition that it need not establish causation in order to receive an award of Defendant's profits, *Lexmark International, Inc.* requires that Plaintiff provide sufficient Rule 56 evidence of proximate cause at the summary judgment stage, which Plaintiff has failed to do.  *See* 134 S.Ct. at 1393-94.